Opinion by JUDGE BERGER
¶ 1 In this "peeping" case, a jury convicted Nimroid Boles Folsom of stalking (serious emotional distress), and two counts of attempted invasion of privacy for sexual gratification. Folsom's principal defense at trial was misidentification.
¶ 2 On appeal he contends that (1) the seizure, search, and later admission into evidence of videos the police found on his iPods violated the Fourth Amendment; (2) the trial court erred when it prohibited the introduction of alternate suspect evidence; (3) the evidence presented at trial was insufficient to convict him of stalking; (4) the victim's show-up and in-court identifications violated his right to due process; (5) and the stalking statute is unconstitutional.[1]
¶ 3 We conclude that based on a United States Supreme Court case that was decided after Folsom's trial, the admission of the videos found on his iPods violated the Fourth Amendment and was not harmless beyond a reasonable doubt. We also conclude that the trial court applied an erroneous test for the admission of alternate suspect evidence and that, under the circumstances, the prohibition of alternate suspect evidence deprived *656 Folsom of a fair trial. Accordingly, we reverse and remand for a new trial.
I. Relevant Facts and Procedural History
¶ 4 The victim was walking through her living room one night after taking a shower when she noticed that the blinds of her living room window were open. She walked toward the window to close the blinds and saw a man standing outside the window. She only saw the side of his face, pretended not to see him, closed the blinds, and dressed. She then went upstairs to see if the man was still there; he was. She saw him jump the fence into her neighbor's yard and then re-enter her yard. She called the police and described the man as a "tanned Caucasian" man, wearing a black hooded sweatshirt, jeans, and glasses.
¶ 5 A few minutes later police officers saw Folsom in an alley less than two blocks from the victim's house. After they watched Folsom apparently looking into windows of apartments along the alley, the officers stopped him. When asked what he was doing, Folsom told officers that he was looking for a place to plug in his van's electric heater. At the time he was stopped, Folsom, a dark-skinned African-American man, was wearing a dark brown leather jacket, green cargo pants, a multi-colored knit cap, and glasses.
¶ 6 Meanwhile, the 911 operator on the phone with the victim told her that an officer was in contact with "whoever was outside of [her] house," and that police would arrive shortly to speak with her. The police then took the victim to where Folsom was being detained for a show-up identification.
¶ 7 At the show-up the victim identified Folsom as the person she saw outside her window that evening, stating that she recognized his glasses. She also told police that she recognized him from a previous incident at her home nearly six months prior.
¶ 8 Based on the victim's identification, the police arrested Folsom and conducted a search incident to arrest. The police seized two iPod devices[2] that Folsom was carrying. They searched both devices and found numerous videos, which were admitted into evidence against him.
II. The Admission of the Videos from Folsom's iPods Violated the Fourth Amendment and Requires Reversal
¶ 9 Folsom argues that the warrantless search of his iPods violated the Fourth Amendment and that because the videos were admitted into evidence against him, the trial was infected by constitutional error. We agree.
A. Additional Facts
¶ 10 The arresting officers found two iPods on Folsom's person. Without obtaining a warrant, they searched the iPods and discovered seventeen videos of two general types. One set of videos showed fully clothed women walking in public places-the videos focused on the lower half of the women's bodies. The second set of videos showed a partially clothed woman changing clothing and masturbating in a bedroom. These latter videos appeared to have been taken through a window.
¶ 11 Folsom moved to suppress the videos found on his iPods as a product of an unconstitutional search. The trial court denied his motion, concluding that the search was a valid search incident to arrest. All of these videos were admitted at trial.
B. Law and Analysis
¶ 12 The United States Constitution protects individuals from unreasonable searches and seizures of their homes or property. U.S. Const. amend. IV. Warrantless searches are presumptively unreasonable unless they fall under one of the established exceptions to the warrant requirement. People v. Dumas , 955 P.2d 60, 62 (Colo. 1998).
¶ 13 A search incident to arrest is one such exception. People v. Marshall , 2012 CO 72, ¶ 10, 289 P.3d 27. This exception "allows law enforcement officers, when making a lawful arrest, to search an arrestee's person and the area within the arrestee's immediate *657 control." People v. Gothard , 185 P.3d 180, 184 (Colo. 2008).
¶ 14 Not surprisingly, the application of the Fourth Amendment to advanced technological devices-some of which are, in reality, portable computers with amazing storage and other capabilities-has been difficult. While ordinarily the police may search a person incident to arrest and seize contraband or other evidence of a crime without further justification, courts have recognized that the warrantless seizure of a person's computer or similar device raises acute Fourth Amendment issues. See Riley v. California , 573 U.S. ----, ----, 134 S.Ct. 2473, 2498, 189 L.Ed.2d 430 (2014) ; United States v. Ganoe , 538 F.3d 1117, 1127 (9th Cir. 2008) ; United States v. Turner , 169 F.3d 84 (1st Cir. 1999).
¶ 15 In Riley , decided after Folsom's trial, the Supreme Court held that data stored on a cell phone could not be searched incident to arrest, and therefore a warrant was required to search the phone. 573 U.S. at ----, 134 S.Ct. at 2493.
¶ 16 The privacy concerns implicated by searching technological devices such as smart phones-which are much more sophisticated than a standard cell phone-are qualitatively different than privacy concerns "implicated by the search of a cigarette pack, a wallet, or a purse." Id. at ----, 134 S.Ct. at 2488-89. Modern devices have large storage capacities and can hold a person's photographs, text messages, emails, videos, internet browsing history, calendars, and more. See id. at ----, 134 S.Ct. at 2489. "The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." Id.
¶ 17 Just as smart phones are essentially minicomputers-that happen to have the ability to be used as a telephone, id. -so are iPods. While an iPod does not have telephonic capabilities, the arresting officer testified that the iPods in this case could store videos, photographs, and music, and access the internet. As relevant here, an iPod is the Fourth Amendment equivalent of the device addressed in Riley .
¶ 18 The Attorney General argues that the search of Folsom's iPods does not require reversal, regardless of Riley , because the officers relied in good faith on binding appellate precedent at the time of the search. Relying on Davis v. United States , 564 U.S. 229, 241, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), the Attorney General observes that evidence obtained when police "conduct a search in objectively reasonable reliance on binding judicial precedent" is not subject to the exclusionary rule, and that Davis requires us to uphold the admission of the videos.
¶ 19 We reject the Attorney General's argument because the judicial opinion relied on, People v. Taylor , 2012 COA 91, 296 P.3d 317, abrogated by Riley , 573 U.S. ----, 134 S.Ct. 2473, does not address or validate the police conduct at issue here.
¶ 20 In Taylor , the division held that a warrantless search of the call history of a cell phone seized incident to an arrest did not violate the Fourth Amendment. Taylor , ¶ 17. But, the facts of Taylor are materially different than the facts presented in this case. Here, the police did not merely access a call list, as in Taylor , but instead conducted a full search of Folsom's iPods (one of which was password protected) and found the videos, which were introduced at trial. The division in Taylor specifically noted that it was "applying the narrower view proposed by some courts that officers may not search all data contained in a cell phone" upon arrest. Id. at ¶ 18 (emphasis added). Because Taylor did not validate the broad search of a technological device that occurred here, the Davis good faith exception is inapplicable.
¶ 21 Riley held "that a warrant is generally required before ... a search [of information on a cell phone], even when a cell phone is seized incident to arrest." People v. Omwanda , 2014 COA 128, ¶ 15, 338 P.3d 1145 (quoting Riley , 573 U.S. at ----, 134 S.Ct. at 2493 ). Because Riley was decided while Folsom's convictions were on direct appeal, we must apply its constitutional holding to this case. Griffith v. Kentucky , 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
*658 ¶ 22 Applying Riley , suppression of the videos is required. See Stone v. Powell , 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) ("The exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment.").
¶ 23 We recognize that the admission of evidence barred by the Constitution can nevertheless be harmless. But we conclude that the admission of the videos here was not harmless beyond a reasonable doubt. See Bartley v. People , 817 P.2d 1029, 1034 (Colo. 1991). While the admission of the first set of videos probably had little probative value (or prejudicial effect), the second set of videos was highly prejudicial, particularly when measured against the weaknesses of the victim's identification of Folsom, as discussed later in this opinion.
¶ 24 Accordingly, the unconstitutional admission of the videos requires reversal. On retrial, the videos must be suppressed.
III. Folsom Was Entitled to Present Alternate Suspect Evidence
A. Additional Facts
¶ 25 Less than two weeks before trial the prosecution disclosed evidence regarding a suspect, other than Folsom, who was involved in similar peeping incidents in the victim's neighborhood. This evidence showed that in a ten-month span, Boulder Police investigated nine incidents of peeping in the area. Of those nine, five occurred at the victim's house. Folsom was charged in two of those incidents. Another person, D.P., was a suspect in the other three incidents at the victim's house. D.P. was a suspect in five of the nine incidents in the neighborhood (including the three at the victim's house).
¶ 26 In one of the incidents (not involving the charges against Folsom) the victim heard noises in her yard, and when she looked outside she saw a man near the window. The victim was unable to see the man's face, but reported that she had seen him in the neighborhood before. The victim recognized D.P. in a photographic array, but was unable to say definitively that it was him she saw outside her house-she could only confirm that she recognized him.
¶ 27 D.P. is a tall, white man, with brown hair and blue eyes. On at least one occasion he was convicted of a crime in the same general geographic area. In that incident, a witness observed D.P. climbing down from the balcony of an apartment building four-tenths of a mile from the victim's house. D.P. was wearing a dark hoodie with the hood pulled up. Police later discovered that D.P. had been taking pictures of unsuspecting women undressing in their homes. He was charged and convicted of second degree criminal trespass.
¶ 28 Folsom sought to introduce evidence of D.P. as an alternate suspect at trial. The trial court refused to admit this evidence, concluding that Folsom had not established a sufficient connection between D.P. and the crimes charged.
B. Standard of Review
¶ 29 We review a trial court's ruling on evidentiary issues, including the admission of alternate suspect evidence, for an abuse of discretion. People v. Stewart , 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion when its ruling "is based on an erroneous view of the law." People v. Elmarr , 2015 CO 53, ¶ 20, 351 P.3d 431.
C. Law and Analysis
¶ 30 A defendant has a constitutional right to present a complete defense. Holmes v. South Carolina , 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). This means that "a criminal defendant is entitled to all reasonable opportunities to present evidence that might tend to create doubt as to [his] guilt." Elmarr , ¶ 26. "Consistent with this right, a defendant may present evidence that another person might have committed the charged offense." People v. Muniz , 190 P.3d 774, 780 (Colo. App. 2008).
¶ 31 To avoid confusing the jury and to prevent alternate suspect evidence from becoming a sideshow that overtakes the principal issue presented at a criminal trial-whether the prosecutor has proved beyond a reasonable doubt that the defendant committed the crime alleged-the admissibility of alternate suspect evidence ultimately depends *659 on the strength of the connection between the alternate suspect and the charged crime. Elmarr , ¶ 22.
¶ 32 In Elmarr , the supreme court addressed these competing interests and described the framework for determining the admissibility of alternate suspect evidence. Id. at ¶ 21. A trial court must "decide the admissibility of similar acts evidence offered by a defendant on a case-by-case basis, looking to whether all the similar acts and circumstances, taken together, support a finding that the same person probably was involved in both the other act and the charged crime." Id. at ¶ 38.
¶ 33 "To be admissible, alternate suspect evidence must be relevant (under CRE 401 ) and its probative value must not be sufficiently outweighed by the danger of confusion of the issues or misleading the jury, or by considerations of undue delay (under CRE 403 )." Id. at ¶ 22. "Because the balance required by CRE 403 favors admission, a reviewing court must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." Id. at ¶ 44 (quoting People v. Rath , 44 P.3d 1033, 1043 (Colo. 2002) ).
¶ 34 At trial, Folsom offered evidence of D.P. as an alternate suspect. The trial court rejected that evidence because the victim had never identified D.P. in a previous incident. While a trial court has broad discretion in deciding whether to admit alternate suspect evidence, when the trial court makes a ruling based on an erroneous view of the law, the court necessarily abuses its discretion. People v. Wadle , 97 P.3d 932, 936 (Colo. 2004).
¶ 35 The trial court evidently read the controlling cases as requiring the victim to have identified the alternate suspect in a previous or related incident. But, the Attorney General does not point to, and we have not found, any such black letter rule. The trial court's application of such a rule to the determination of whether Folsom was entitled to present alternate suspect evidence was an abuse of discretion.
¶ 36 The trial court also relied on People v. Perez , 972 P.2d 1072 (Colo. App. 1998), in finding that Folsom had not presented sufficient evidence to show anything more than opportunity or motive connecting D.P. to the charged crime. However, based on our reading of Perez , this reliance was misplaced.
¶ 37 In Perez , the defendant was convicted of sexually assaulting a young girl, and he sought to introduce evidence that the son of the victim's caregiver could have committed the crime, because the son was on probation for misdemeanor sexual assault. Id. at 1073-74. The trial court excluded evidence of the son as an alternate suspect because it found Perez had not established a sufficient connection between the son and the crime charged. Id. at 1075. The Perez division upheld the rejection of the alternate suspect evidence because the defendant offered no evidence "indicating any distinctive similarities in the details of the crimes." Id.
¶ 38 Unlike Perez, Folsom presented "more than an unsupported inference, or a possible ground for suspicion," id. at 1074, that D.P. committed the crime charged. The evidence proffered by Folsom established not only that D.P. had been convicted of a similar crime in the same geographic area, but also that D.P. had been linked to numerous other incidents of peeping in the area in the same general timeframe. Indeed, five of these incidents occurred at the victim's house and D.P. was, at least at one time, suspected of committing three of these crimes.
¶ 39 Moreover, the victim actually identified D.P. in one incident as a person whom she recognized from the neighborhood even though she could not definitively identify him as the peeper in that incident. As well, D.P. more closely matched the victim's description of the peeper than did Folsom.
¶ 40 The evidence offered by Folsom, taken collectively, established a non-speculative connection between D.P. and the charged crime. Furthermore, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403 ; People v. Flowers , 644 P.2d 916, 920 (Colo. 1982).
*660 ¶ 41 As the Elmarr court noted, in this context "the most likely concern will be the confusion of the issues or misleading the jury, or considerations of undue delay." Elmarr , ¶ 43. However, in balancing the probative value of the evidence against the relevant policy considerations in CRE 403, we must afford the maximum probative worth to any particular piece of evidence. Elmarr , ¶ 44. Based on the record, undue delay was not a factor here, so the primary concern would be the confusion of the issues or misleading the jury.
¶ 42 Folsom's primary defense at trial was misidentification, and the existence of another viable suspect was highly relevant to that defense. Giving the alternate suspect evidence its maximum probative worth, and the CRE 403 considerations the minimum prejudicial effect, see Rath , 44 P.3d at 1043, the evidence should have been admitted.
¶ 43 By restricting the presentation of relevant evidence regarding an alternate suspect, the trial court violated Folsom's "basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " Krutsinger v. People , 219 P.3d 1054, 1061 (Colo. 2009) (quoting Crane v. Kentucky , 476 U.S. 683, 690-91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ). Because the evidence identifying Folsom as the criminal was far from overwhelming, the trial court's error was not harmless beyond a reasonable doubt. See Hagos v. People , 2012 CO 63, ¶ 11, 288 P.3d 116. Accordingly, we reverse and remand for a new trial.
IV. The Evidence Was Sufficient to Convict Folsom of Stalking
¶ 44 Folsom next argues that the evidence presented at trial was insufficient for the jury to convict him of stalking.[3] We disagree.
¶ 45 To determine whether the evidence was sufficient to sustain the defendant's conviction, we review the record de novo. Dempsey v. People , 117 P.3d 800, 807 (Colo. 2005).
¶ 46 We employ the "substantial evidence" test to determine "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." Clark v. People , 232 P.3d 1287, 1291 (Colo. 2010) (quoting People v. Bennett , 183 Colo. 125, 130, 515 P.2d 466, 469 (1973) ). "In assessing the sufficiency of the evidence, we must consider all the evidence admitted at trial, including the erroneously admitted evidence...." People v. Hard , 2014 COA 132, ¶ 39, 342 P.3d 572.
¶ 47 Moreover, we must afford the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence. Clark , 232 P.3d at 1292 ; People v. Gonzales , 666 P.2d 123, 127-28 (Colo. 1983).
¶ 48 It is the jury's function to determine the credibility of the witnesses, "to consider and determine what weight should be given to all parts of the evidence and to resolve conflicts, testimonial inconsistencies, and disputes in the evidence." People v. McIntier , 134 P.3d 467, 471 (Colo. App. 2005). "An appellate court is not permitted to act as a thirteenth juror and set aside a verdict because it might have drawn a different conclusion had it been the trier of fact." Id. at 471-72.
¶ 49 As relevant here, section 18-3-602(1)(c), C.R.S. 2017, provides that a person commits stalking if directly or indirectly, the person knowingly "[r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person ... in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress."
¶ 50 Folsom first argues that an incident six months before the show-up identification was an accident, and that he did not "knowingly" approach or contact the victim. But, viewing the evidence presented in the light most favorable to the prosecution, a reasonable *661 juror could conclude that Folsom knowingly followed, approached, or contacted the victim on at least two occasions.
¶ 51 At trial the victim testified that she saw Folsom in her yard on two separate occasions-on the night of the show-up in March, and six months prior, in August.
¶ 52 The victim testified that in August Folsom entered her backyard while she was sitting on her porch. She asked him what he was doing, and he told her that he was looking for a place to urinate. She told him to leave and he immediately complied.
¶ 53 Similarly, in March, when police asked Folsom what he was doing in the alley, he told them he was looking for a place to urinate, and only after some discussion did he tell police that he was looking for a place to plug in his vehicle.
¶ 54 All of this evidence, taken together, could lead a reasonable person to conclude that Folsom knowingly and repeatedly followed, approached, contacted, surveilled, or made communication with the victim in August and again in March.
¶ 55 Folsom next argues that the August incident would not have caused a reasonable person to suffer serious emotional distress. However, it is not each individual act of stalking that must cause a reasonable person to suffer emotional distress, but the combined acts of the defendant that would cause such a result. As the supreme court noted in People v. Cross , 127 P.3d 71, 76 (Colo. 2006) :
The language the legislature chose to use is plain. The statutory phraseology "in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress" relates [to] the context of defendant's acts -utilizing a reasonable person standard-to the proscribed conduct....
(Emphasis added.) The evidence presented at trial, viewed in the light most favorable to the prosecution, established that Folsom had been in the victim's yard twice in six months-a place he had no legal right to be. The two acts, taken together, could lead a reasonable juror to find a reasonable person would suffer serious emotional distress.
¶ 56 Finally, Folsom argues that the prosecution did not prove that the two incidents actually caused the victim serious emotional distress. At trial, the victim testified that after the August incident she did not feel safe in her home, she started seeing a therapist, and she lost sleep for several months. Viewing this evidence in the light most favorable to the prosecution, a reasonable juror could conclude that the victim experienced serious emotional distress. See People v. Carey , 198 P.3d 1223, 1233 (Colo. App. 2008) (holding that evidence was sufficient to prove serious emotional distress based on victim's testimony that she was "beside" herself, had an increased awareness of her surroundings, and was "very fearful").
¶ 57 For all these reasons, we conclude that the evidence presented to the jury was sufficient to support the jury's verdict.
V. The Victim's Identifications of Folsom
¶ 58 Folsom next argues that the admission of the victim's out-of-court and later in-court, identifications violated his right to due process because the out-of-court identification was impermissibly suggestive and unreliable. We disagree.
¶ 59 We review the constitutionality of pretrial identification procedures as a mixed question of law and fact. People v. Whittiker , 181 P.3d 264, 272 (Colo. App. 2006). Thus we defer to the trial court's findings of fact, but review its legal conclusions de novo. Bernal v. People , 44 P.3d 184, 190 (Colo. 2002).
¶ 60 A defendant is denied due process of law if an out-of-court identification is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. People v. Dotson , 55 P.3d 175, 178 (Colo. App. 2002). "One-on-one showup identifications are not per se violative of due process, although the procedure is viewed with disfavor because of its strong potential for unnecessary suggestiveness." People v. Theus-Roberts , 2015 COA 32, ¶ 8, 378 P.3d 750 (citing People v. Mascarenas , 666 P.2d 101, 109 (Colo. 1983) ).
*662 ¶ 61 When, as here, an out-of-court show-up identification is highly suggestive, the court must consider whether the identification was nonetheless sufficiently reliable under the totality of the circumstances to meet the requirements of due process. Whittiker , 181 P.3d at 272. In determining the reliability of the identification, courts must consider (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the criminal; (4) the level of certainty demonstrated at the time of the identification; and (5) the time between the crime and the identification. Bernal , 44 P.3d at 191.
¶ 62 The trial court found that the victim had a good opportunity to view and was able to see the suspect through her window as she closed the blinds. She also observed the man run away and jump over a chain-link fence into the neighboring yard. It also found that her degree of attention was high, that only minutes passed between the crime and the time of the show-up, and that the victim was certain in her identification of Folsom.
¶ 63 The discrepancies between the victim's description of the man she saw at her window and Folsom's physical appearance when he was detained by police only minutes later are very troubling. However, we have not found any controlling case that holds that such discrepancies alone require a court to suppress an identification. Cf. People v. Smith , 620 P.2d 232 (Colo. 1980) (holding that based on the totality of the circumstances, the out-of-court identification of the defendant did not violate due process.).
¶ 64 There is also a question of whether the trial court's finding that the victim had a high degree of attention is supported by the record. People v. Kaiser , 32 P.3d 480, 483 (Colo. 2001) ("In reviewing suppression appeals, we grant deference to a trial court's findings of historical fact that are supported by competent evidence in the record."). The victim told the officers that she deliberately looked away from the man she saw at her window, casting at least some doubt on her ability to identify the man and on her degree of attention-two of the five factors a court considers in determining reliability. Neil v. Biggers , 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ; Bernal , 44 P.3d 184.
¶ 65 But, in deferring to the trial court's historical findings of fact, we cannot say that there is a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite , 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (quoting Simmons v. United States , 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ). Moreover, as the Supreme Court noted in Perry v. New Hampshire ,
The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses.
565 U.S. 228, 237, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012) (citations omitted).
¶ 66 As the Court noted in Perry , "juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' have we imposed a constraint tied to the Due Process Clause." Id. (citation omitted) (quoting Dowling v. United States , 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) ).
¶ 67 Against this legal backdrop, we cannot conclude that the victim's out-of-court identification was so impermissibly suggestive and unreliable as to violate Folsom's due process rights.
¶ 68 Because we hold that the out-of-court identification was constitutionally permissible, we need not address whether there was an independent basis for the victim's in-court identification. See People v. Mack , 638 P.2d 257, 266 (Colo. 1981), superseded by statute on other grounds as stated in People in Interest of W.P. , 2013 CO 11, 295 P.3d 514.
*663 VI. Constitutionality of Colorado's Stalking Statute
¶ 69 Folsom also argues for the first time on appeal that the stalking statute, section 18-3-602(1)(c), is unconstitutionally vague on its face and as applied in his case. Because Folsom's as-applied challenge requires a fact-intensive analysis, which is more properly the province of the trial court, we decline to address it here. See People v. Torres , 224 P.3d 268, 273 (Colo. App. 2009) ("We decline to address this contention because we cannot determine the constitutionality of an as applied challenge without a complete record of relevant facts.").
¶ 70 We conclude that the statute is constitutionally valid on its face. We review the constitutionality of a statute de novo, Hinojos-Mendoza v. People , 169 P.3d 662, 668 (Colo. 2007), but statutes are presumed to be constitutional. People v. Hickman , 988 P.2d 628, 634 (Colo. 1999).
¶ 71 The Colorado Supreme Court and another division of this court have both concluded that a prior version of this statute, which was nearly identical, was not unconstitutionally vague. See Cross , 127 P.3d at 78 ; People v. Richardson , 181 P.3d 340, 343-45 (Colo. App. 2007). We accept the reasoning of Cross and Richardson , and reject Folsom's facial challenge to section 18-3-602(1)(c).
VII. Other Issues
¶ 72 Because we are reversing Folsom's convictions, and because the remaining claims do not involve circumstances likely to recur in a retrial, we decline to address them. We also decline to address the constitutionality of Folsom's sentence because we have reversed his conviction and he is no longer subject to the challenged sentence.
IX. Conclusion
¶ 73 The judgment of conviction is reversed and the case remanded for a new trial.
JUDGE WEBB and JUDGE LICHTENSTEIN concur.

Folsom raises a number of additional claimed errors as to both the guilt determination and sentencing that we need not address in view of our disposition.

The record establishes that the devices in this case were iPod Touches, which have the ability to store photographs, videos, and music, as well as the ability to connect to the internet.

Folsom does not challenge the sufficiency of the evidence supporting his conviction for attempted invasion of privacy for sexual gratification.